PETER MATZ et al. v. MISSOURI PACIFIC RAIL-
WAY COMPANY, Appellant.

In Banc, March 9, 1909.

1. **NEGLIGENCE: Humanitarian Doctrine: Child Suddenly Put-
ting Himself in Danger.** Where there was positive evidence
that the child, in crossing the railroad track, crossed over, saw
a train coming on an adjoining track fourteen feet away, sud-
denly stepped back onto the main track, and was struck by a
train on that, and plaintiff puts the case to the jury on the
last-chance doctrine, the court should not refuse an instruction
for defendant to the effect that, if these facts were found by
the jury, plaintiffs could not recover if it was impossible to
have stopped the train in time to avoid striking him after he
was seen to turn back, although the train was being run in
excess of the maximum speed fixed by ordinance.

2. ———: ———: **Contributory Negligence.** The humanitar-
ian doctrine has its origin in conceded negligence on the part
of the injured party. If the negligence of defendant and of the
injured party operate together to produce the injury, there is
usually no liability except under that doctrine; by which is
meant that, although the injured party may have been guilty
of negligence in placing himself in a position of peril, yet if the
railroad company by the exercise of ordinary care saw him
in such position, or by the exercise of ordinary care could
have seen him in such position, in time to have averted the
injury, and did not, then defendant is liable.

3. **PRACTICE: Demurrer: Not Asked at Close of Case: Con-
sidered on Appeal.** Where plaintiff's case is not aided by de-
fendant's evidence, a demurrer offered at the close of plaintiff's
case and not renewed at the close of the whole case, will be
considered on appeal, if urged as a ground in the motion for a
new trial. And besides, where the sufficiency of the whole
evidence is challenged in the motion, the appellate court must
examine the evidence and pass upon its probative force.

4. **NEGLIGENCE: Humanitarian Doctrine: Judgment Reversed.**
The little boy separated from his companions, crossed defend-
ant's track, proceeded towards another railroad track fourteen
feet further on, and there unexpectedly saw a freight train go-
ing west, and suddenly turned back on the defendant's track
or near to it and was struck by a passenger train going east.
*Held*, that, even under the humanitarian doctrine, his parents
cannot recover for his death. It was an accident.

5. ————: ————: **Two Minutes on Track.** A little boy testified that deceased had been on defendant's track "just about two minutes" after stepping back on it before the train hit him, but the context shows that he really did not mean that, but meant that it was about that long after deceased and his companions separated and deceased walked along the track, passed off towards another, and seeing a train on that suddenly turned back to defendant's track, before he was immediately struck by the train. *Held*, this evidence is not sufficient to submit to the jury the question of whether by the exercise of ordinary care the trainmen could have stopped the train after discovering him on the track before hitting him.

Appeal from Jackson Circuit Court.—*Hon. Hermann Brumback,* Judge.

REVERSED.

*Elijah Robinson* for appellant.

(1) Plaintiffs' own evidence showed that they were not entitled to recover, and therefore the judgment should be reversed. The deceased had crossed over the defendant's tracks and got absolutely beyond any point of danger from the east-bound passenger train, the train which struck him; but a west-bound freight train on the Chicago & Alton track caused him to run back onto the Missouri Pacific track, immediately in front of the engine of said east-bound passenger train, and so close thereto that it was absolutely impossible for the employees of the defendant in charge of said engine to prevent it striking him. (2) The trial court committed error in giving plaintiffs' instruction 1. 1. Said instruction purports to cover the whole case, but absolutely ignores an important issue raised by the pleadings and supported by the evidence. It authorized the jury to find for the plaintiffs, regardless of whether the deceased was guilty of contributory negligence, notwithstanding the fact that the issue of contributory negligence was made by defendant's answer and was strongly supported

by the evidence in the case. There is no principle of law better settled by the decisions of the appellate courts of this State than that the giving of an instruction which authorizes a verdict for the plaintiff and ignores any defense set up by the defendant, and in support of which there is any substantial evidence, constitutes reversible error. Stanfield v. Loan Assn., 53 Mo. App. 595; Laughlin v. Gerardi, 67 Mo. App. 372; Cameron v. Hart, 57 Mo. App. 142; Holladay-Klotz Co. v. Moss Tie Co., 87 Mo. App. 167; Galbreath v. Carnes, 91 Mo. App. 512; Ormsby v. Insurance Co., 98 Mo. App. 371; Morris v. Railroad, 99 Mo. App. 455; Mfg. Co. v. Guggemos, 98 Mo. 391; Gurley v. Railroad, 104 Mo. 211; Dahlstrom v. Railroad, 96 Mo. 99; State v. Lentz, 184 Mo. 223. 2. Said instruction is broader than the petition, not being confined to the grounds of negligence alleged in the petition, and for that reason the giving of it constitutes reversible error. A long and unbroken line of decisions in this State has established the rule that instructions must not be broader than the pleadings—must not submit to the jury grounds of negligence not set forth in the pleadings. Bank v. Westlake, 21 Mo. App. 565; State ex rel. v. Sitlington, 51 Mo. App. 256; Harper v. Railroad, 70 Mo. App. 604; Colliott v. Mfg. Co., 71 Mo. App. 163; Edwards v. Railroad, 79 Mo. App. 257; Kattelmann v. Fire Assn., 79 Mo. App. 447; Kirby v. Railroad, 85 Mo. App. 345; Pryor v. Railroad, 85 Mo. App. 367; Fegan v. Grain Sep. Co., 92 Mo. App. 236; Budd v. Hoffheimer, 52 Mo. 297; Pinney v. Berry, 61 Mo. 366; Bank v. Murdock, 62 Mo. 70; Abbott v. Railroad, 83 Mo. 271; Mellor v. Railroad, 105 Mo. 455; Coontz v. Railroad, 115 Mo. 669; Slaughter v. Railroad, 116 Mo. 269; Chitty v. Railroad, 148 Mo. 64; De Donato v. Morrison, 160 Mo. 581; Wolfe v. Supreme Lodge, 160 Mo. 675; Heinzle v. Railroad, 182 Mo. 528; Logan v. Railroad, 183 Mo. 582. (3) The trial court com-

mitted error in refusing instruction 2, asked by defendant. Deceased got far enough from the defendant's track to be out of the reach of danger and then suddenly came onto the track again, in front of the engine, and so close to it that it was impossible for the defendant's employees to avoid injuring him.    (4) It did not follow from the fact that deceased was only about ten and a half years of age that he was not guilty of contributory negligence.   Ridenhour v. Railroad, 102 Mo. 270; Payne v. Railroad, 129 Mo. 421; Spillane v. Railroad, 135 Mo. 425; Coy v. Railroad, 86 Pac. 468.

*Scarritt, Scarritt & Jones* for respondents.

(1)   The court did not err in overruling the demurrer to plaintiffs' evidence.   The case went to the jury on the part of the plaintiffs on a single instruction stating in the usual phraseology the humanitarian doctrine and the evidence was ample to support it. Chamberlain v. Railroad, 133 Mo. 537; Morgan v. Railroad, 159 Mo. 262; Peterson v. Railroad, 199 Mo. 340; Wise v. Railroad, 198 Mo. 546; Eppstein v. Railroad, 197 Mo. 720; Holmes v. Railroad, 105 S. W. 624; Kellny v. Railroad, 101 Mo. 67; Myers v. Railroad, 99 Mo. App. 363; Sepetowski v. Railroad, 102 Mo. App. 110; Murrell v. Railroad, 105 Mo. App. 88; Rapp v. Railroad, 190 Mo. 144; Deschner v. Railroad, 200 Mo. 327; White v. Railroad, 202 Mo. 539.   (2)   Defendant will not be heard to say that there was no evidence, or that there was not sufficient evidence to take the case to the jury upon the humane doctrine, for it requested and the court granted its instruction 4, predicated upon the recited fact that "although you may believe from the evidence in the case that the deceased was walking along defendant's main line track prior to the time of the accident, and that the defendant's

engineer could have seen him and did see him for a distance of more than six hundred feet from the point where the accident occurred, still," etc. It is a well-settled rule of law in this State that if a litigant through his own instructions submits an issue of fact to a jury and that issue is ruled against him he will not thereafter be heard to say that there was not sufficient evidence to sustain the jury's finding upon that issue. Mercantile Co. v. Burrill, 66 Mo. App. 117; Fenwick v. Bolwing, 50 Mo. App. 516; Seiter v. Vischoff, 63 Mo. App. 160; Jennings v. Railroad, 99 Mo. 394; Hopkins v. Modern Woodmen, 94 Mo. App. 409; Hartman v. Railroad, 48 Mo. App. 619; Randolph v. Frick, 57 Mo. App. 400; Gray v. Seligman, 75 Mo. 31; Minton v. Steele, 125 Mo. 181. (3) There was no error in refusing defendant's instruction 2. It assumes facts establishing the defendant's negligence; and it is not an open question that the deceased child, barely ten and a half years old, cannot as a matter of law be declared guilty of contributory negligence in being upon a railroad track at a place where people were accustomed to travel, right near a much-traveled street crossing, when he was confused by a switch engine on one side of him and a passing freight train on the other side, and when defendant's train came upon him at the reckless speed of eighteen miles an hour without giving any warning whatever of its approach. (4) Defendant's fifth instruction, which was also refused, is a less covert and insinuating effort to have the court declare as a matter of law that the child was guilty of negligence which caused his own death. Holmes v. Railroad, 190 Mo. 98; Deschner v. Railroad, 200 Mo. 310; Campbell v. Railroad, 175 Mo. 161; Walker v. Railroad, 193 Mo. 483; Young v. Oil Co., 185 Mo. 667.

## IN BANC.

PER CURIAM:—The opinion of GRAVES, J., in Division is adopted as the opinion of the Court in Banc. All concur except LAMM, J., who is of opinion that the case should be reversed, but should also be remanded rather than reversed outright.

## IN DIVISION ONE.

GRAVES, J.—The plaintiffs, who are husband and wife, bring this action for the alleged negligent killing of their child, Carl Matz. By the petition, it is charged that the child, a boy over ten years of age, was killed by a Missouri Pacific east-bound passenger train near the intersection of Chestnut and Guinotte avenues in Kansas City, Missouri, at about 5:30 p. m., August 3, 1904.

It is charged that this portion of plaintiff's railroad track had been continuously used for a long period of time by pedestrians, and that such use was well known by defendant. For negligence, the petition charges (1) a violation of a speed ordinance of Kansas City, which ordinance limits the speed of trains at street crossings to six miles per hour; (2) reckless and dangerous rate of speed in a thickly populated portion of the city; (3) the failure of defendant to protect deceased whilst in imminent danger, when by the exercise of ordinary care and caution, the servants of defendant would have seen him in such peril, in time to have avoided the injury either by stopping or slowing the train or by sounding the whistle, or ringing the bell, neither of which was done. This last portion of the petition fully and explicitly pleaded the necessary elements and facts for the application of the humanitarian doctrine.

Answer was a general denial and plea of contributory negligence upon the part of deceased.

For the plaintiffs, the cause was submitted solely on the humanitarian rule, as appears by the following instruction:

"The court instructs the jury that if you believe from the evidence that the defendant on the afternoon of August 3, 1904, operated a certain engine, tender and train of cars, by its servants, agents and employees upon and in charge thereof, upon its railroad over and across a certain public street and thoroughfare in Kansas City, Missouri, known as Chestnut avenue, at or about the place where said avenue intersects a certain street or avenue in Kansas City, Missouri, known as Guinotte avenue, and that Carl Matz was the infant unmarried son of the plaintiffs herein, and that plaintiffs were husband and wife, and that he, the said Carl Matz, was upon the railroad track of the defendant in front of said engine, tender and train of cars, and upon the same track as said engine, or near thereto, and in a position of danger and peril from said approaching engine and train, and that the agents, servants and employees of the defendant in charge of said engine and train saw, or by the exercise of ordinary care might have seen him, the said Carl Matz, upon said railroad track or near thereto, and in a position of danger and peril from said approaching locomotive and train, in time, by the exercise of ordinary care, to have avoided any injury to him, and they failed to exercise ordinary care to avoid injuring him, and by such failure to exercise ordinary care they caused or permitted said locomotive to run upon and against the said Carl Matz and to injure him, and that he died as the result of such injuries, then your verdict should be for the plaintiffs in the sum of five thousand dollars."

The instruction is but a slight modification of one asked by plaintiffs. They asked but one instruction,

so that their theory of the case is clearly outlined in the instruction above, for the slight amendments made by the court do not change the theory.

At the close of plaintiff's case the defendant asked an instruction in the nature of a demurrer to the evidence. This the court refused. At the close of the whole case, the defendant asked some five instructions, two of which were given and three refused, but did not ask an instruction in the nature of a demurrer to the evidence at this time. This we deem unimportant as the defendant introduced no evidence which would aid in the least the case made by plaintiffs. · Verdict and judgment went for plaintiffs in the sum of five thousand dollars and defendant brings the case here. In the brief it is strenuously insisted that there is no case to go to the jury and the demurrer should have been given.

The *locus in quo* is fully presented by a plat in evidence, which we attach and use to lend us assistance in· detailing the facts. The plat is shown on the opposite page.

The plat does not specifically so show, but the evidence does show, that the streets running north and south, indicated both to the east and west of the Ferd Heim Brewing Company property, are continuations of ·Guinotte avenue. The south line of the Heim's property is the line indicated by the word "fence," so that Guinotte avenue is upon three sides of the Heim Brewing Company property.

The deceased, Ottis Rich, Lonnie McCall and George Kumpf, all about the same age, had been at a pond north and east of the brewery property. In the crowd was a little girl who did not testify. With them upon their return from the pond was Alex Kumpf, father of George. They came from the north on the east side of the brewery property, to the corner on the plat

marked "carpenter shop." The deceased to go home had to go south on Chestnut avenue and beyond the C. & A. Ry. tracks. The other members to get home had to simply proceed west on Guinotte avenue. The deceased was struck by an east-bound train on the main line of the Missouri Pacific, thrown high in the air and fell to the ground, a little east of an anchor post, which stands a little north of the north switch track of that road. The exact point where the child was when he was struck is not made certain but it was evidently to the west of the point where his body fell. The evidence shows that the people in going from Chestnut avenue to that part of Guinotte avenue east of the brewery property frequently angled from Chestnut avenue at the Missouri Elevator and going in a northeasterly course, crossed the several tracks of the C. & A. Ry. Co. and the Mo. Pac. Ry. Co., and in returning they would come back in a southwesterly direction and into Chestnut avenue at or near the Missouri Elevator corner. It is quite clear from the evidence that this little boy undertook to angle across the tracks at some point after they reached the railroad tracks, but the exact point as to where he left Guinotte avenue to go upon and across the tracks is not clear. The evidence shows that a boy upon the track could be seen by the engineer of an east-bound train from a point a quarter of a mile or more west of Chestnut avenue, and west of the point where this child was hurt. The evidence shows that the train was running eighteen miles per hour and with the appliances could have been stopped within 250 feet. The real dispute between the parties is where the boy was just before the moment prior to the collision. Plaintiffs urge that the evidence shows that the boy had been on the main track where he was struck for at least two minutes or more prior to the collision, and that there was no bell rung, whistle sounded or attempt to slow the train.

On the other hand the defendant urges that the evidence shows that the boy had crossed over its main track and had gotten about to the north track of the C. & A. Ry. which was fourteen feet south of the defendant's main track, and that as he was about to cross the C. & A. track a west-bound freight train came along on the north track of that company, at which the boy darted back to the north and toward his companions, and upon reaching the main track of the Missouri Pacific was struck and killed. The evidence comes from these three little boys and the old German, Alexander Kumpf, and is difficult to understand and analyze. The old gentleman, Kumpf, evidently talked in broken English and did not understand questions readily. However, he was picking up bits of wood and coal, putting them in a little wagon which the children were pulling, and does not claim to have seen the deceased just at the time of the collision. The three little fellows are the only ones who locate the deceased just the moment before and at the time of the accident.

Ottis Rich, twelve years of age, and the oldest boy in the crowd, after detailing their doings at the pond and their return to the street corner near the railway tracks, being further interrogated, said: "And when we got to where the road turns up in there, he cut across to go home, and when he got about the middle of the tracks —

"Q. (Interrupting.) What corner did you get to?

"Mr. Robinson: I object to that; he said when he got to the middle of the tracks.

"The Court: Finish what you started.

"Mr. Scarritt: He said he got to the corner and I asked him what corner and was going to follow it by asking where he went then.

"Mr. Robinson: I object to that, he didn't say he got to the corner.

"THE COURT: Go ahead and say what you started to say, Ottis.

"A. Just as we got down along there by that little gas house, or whatever you call it, the road turns—

"MR. SCARRITT: Q. Where is that? A. Where the road turns, the road turns there and goes straight.

"Q. In which direction? A. West.

"Q. Now, is the house you mean the house at the corner of the Heim Brewery property? A. I don't know what you call it there.

"Q. How close to the railroad tracks were you? A. About half a block.

"Q. Now, what happened; go ahead and tell your own story in your own way? A. Where the road turns he cut across and tried to go home, and just as he got on this here track, on this side of the Missouri Pacific, the freight train came and he jumped on the other track to get out of the road, and the passenger train came along and struck him."

Then after stating that they all came down close to the railroad tracks, he further says:

"Q. What did you come to when you turned? A. I don't know what you call it.

"Q. Did you come to the railroad tracks?

"MR. ROBINSON: I object to that question.

"Objection overruled, to which ruling of the court defendant duly excepted at the time.

"Q. Go ahead and answer the question, Ottis. A. Not clear to them; about two yards from them.

"Q. And when you got that close to the railroad tracks which way did you and the wagon go? A. West.

"Q. Who was pulling the wagon? A. Mary, George and Lonnie.

"Q. What were you doing? A. Pushing.

"Q. What was Charlie Matz doing? A. He was crossing the railroad.

"Q. Which direction was he going? A. South-west.

"Q. How far did he go now from that before the train struck him? A. About one-half a block.

"Q. In which direction did he go? A. · South-west.

"Q. And where was he walking? A. Across the railroad.

"Q. In which direction was he walking?

"MR. ROBINSON: I object to that as repetition.

"THE COURT: Objection sustained, he has said southwest twice.

"Q. Now, were you, or any of you children, talking to Charlie Matz? A. No, sir, but Mr. Kumpf was.

"Q. Where was Mr. Kumpf? A. He was walk-ing behind the wagon.

"Q. Where was he walking? A. Behind the wagon.

"THE COURT: Was he walking in the road? A. Yes, we was all in the road.

"MR. SCARRITT: Q. Was Charlie Matz in the road? A. · No, sir.

"Q. Where was he walking? A. He cut across to go home.

"Q. Now after he left you, how far did he go before he was struck? A. About half a block.

"Q. What did he have with him? A. He had a can of fish.

"Q. And in which direction were you and the wagon going? A. West.

"Q. And how far did you and the wagon go after you turned west before he was struck? A. We went about four yards from the road; from Guinotte avenue.

"Q. You went pretty close up to Guinotte ave-nue? A. Yes, sir.

"Q. What did you say happened when you got up there? A. Just as we got up there, he was going across. He was on this side, on this track on this side of the Missouri Pacific, and there was a freight train there and he jumped out of the road of it on to the Missouri Pacific and then the train came. He got about a foot from there, and then he started to run back to us and the train struck him.

"Q. What did you see then? A. Well, I seen him go up in the air and I seen him fall."

Lonnie McCall, aged eleven years, among other things, says:

"Q. Now, just tell the jury how you came as you came southeast to the brewery property? A. Well, we came right straight on down there, and came right up the wagon road, and Carl was walking on the track.

"Q. Where were you walking? A. Pulling the wagon out in the road.

"Q. How far did he walk up the track? A. He walked about half a block.

"Q. Was that the same track he was killed on?

"MR. ROBINSON: I object to that question. Let him state what track it was.

"Objection overruled, to which ruling of the court defendant duly excepted at the time.

"THE COURT: Was that the same track he was killed on? A. No, sir; he had got on one track and went to cross back and got on the same track he had been on.

"MR. SCARRITT: Q. Then how far did he walk up that track?

"MR. ROBINSON: I object to that question because it assumes that he did walk up that track before he was killed.

"Objection overruled, to which ruling of the court the defendant duly excepted at the time.

"Mr. Robinson: I don't like Mr. Scarritt to suggest these answers to this little boy by assuming a state of facts that does not exist.

"Objection overruled, to which ruling of the court defendant duly excepted at the time.

"Q. How far did he walk up that track? A. I couldn't say just how far, but I think a half a block.

"Q. What happened then? A. He got out of the way of one train, and when he went to get out of the way of the other one, a freight train, he got in the way of the passenger.

"Q. What did he have with him? A. He had a can with some little fish in it.

"Q. Were you and the other children talking with him as he walked? A. Yes, sir.

"Q. How far apart were you and he as you walked up there? A. Well, we was just a little ways apart and he was in front of us.

"Q. What were you doing? A. Pulling the wagon.

"Q. What was he doing? A. Carrying the fish on the railroad.

"Q. Which track was he on? A. He was on the north track.

"Q. Do you know what railroad track that is? A. No, sir.

"Q. Do you know what company it belongs to? A. No, sir.

"Q. How far did he walk up that track? A. He walked about half a block.

"Q. Now was that the track he was on when he was struck?

"Mr. Robinson: I object to that question as leading:

"The Court: Objection overruled.

"Mr. Robinson: I want to make my objection explicit. He said he got on the north track and walked

along that track, and then Mr. Scarritt asked him if that was the track on which he was killed, and the evidence shows that he was not killed on the north track.

"Objection overruled. To which ruling of the court the defendant duly excepted at the time.

"Q. Was that the track on which he was killed or not? A. He was killed by the passenger, and the passenger was on the main track.

"Q. Was that the track he was walking on? A. Yes, sir.

"Q. Did you hear that Missouri Pacific train that struck him ring the bell or blow the whistle before it struck him? A. No, sir.

"Cross-examination by Mr. Robinson:

"Q. Did you holler at him before he was struck? A. Yes, sir.

"Q. Who else hollered at him besides you? A. George Kumpf did and Mr. Kumpf.

"Q. What was it you hollered at him? A. To get out of the way.

"Q. The train was right close to him when you hollered, was it? A. Yes, sir.

Q. And he didn't have time to get out of the way? A. No, sir.

"Q. Now was he struck on the track closest to you or the next track south of that? A. We was between the two tracks.

"Q. Did you have your wagon between the two tracks? A. We had the wagon between the old switch track and the main track.

"Q. The old switch track is the north track there? A. Yes, sir.

"Q. That is the track you said Carl was walking on about half a block? A. No, sir; I said he was walking on the main track.

"Q. Had he got off that main track and started

to go across the other track when he saw this freight train coming? A. Yes, sir.

"Q. That is, after he was walking along the main track, he got off this main track and started on to the other track and saw this freight train coming, and jumped back on the main track to get out of the way of the freight train, and you saw this passenger train coming and hollered at him to get off the track; is that right? A. Yes, sir.

"Q. But the passenger train was so close to him then after he jumped off that track and back on to the main track that he didn't have time to get off before the passenger train struck him; is that it? A. Yes, sir.

"Q. If he hadn't seen that other train coming after he had got off the main track, and jumped back on to the main track again, he would not have been struck, would he? A. No, sir."

George Kumpf, aged 12 years, said:

"Q. Where did you go then? A. We stopped to play a little, and papa came and said, 'Why don't you come on?' and we went on, and he was picking up little pieces of wood and putting them on the wagon, and he saw a piece of coal across the track and started to get it, and Carl started straight over, and when he got to the Missouri Pacific track he turned west.

"Q. What happened then? A. A freight came on the C. & A.

"Q. You say after you came down he went over on the tracks? A. Yes, sir.

"Q. Which direction did he go then? A. Southwest.

"Q. Which way was he walking? A. When he got over on the main track he turned down.

"Q. Which direction? A. West.

"Q. How far did he go along that track? A. About half ways between the flagman and the street.

"Q. What do you mean by the flagman? A.

Where he has got the little house there at Chestnut Avenue.

"Q. Is there a flagman here at Chestnut? A. Yes, sir.

"Q. Where does he stay? A. He has a little building there now.

"Q. How far did you say Carl went up that track? A. He went half ways from Chestnut to Guinotte back of the brewery.

"Q. About half way from the east line of the Heim Brewery to Chestnut? A. Yes, sir.

"Q. What happened then? A. A freight came on the C. & A. and that was just a little past when the engine struck him.

"Q. The engine of what struck him? A. The passenger.

"Q. Which direction was the passenger going? A. East, and the freight was going west.

"Q. What track was the passenger train on? A. On the Missouri Pacific.

"Q. Is that the same track Carl was on? A. Yes, sir.

"Q. Then what happened? A. It struck him and he flew up in the air and he fell right on the switch track.

"Q. Whereabouts did he fall on that switch track? A. He fell about ten feet back.

"Q. Do you know where that anchor post, or big post like a telephone pole is? A. He went just a little past that, about a yard.

"Q. East of that? A. Yes, sir; his head was laying on the track.

"Q. Did you hear any bell rung or whistle blown on that passenger train before it hit him? A. No, sir.

"Cross-examination by Mr. Robinson.

"Q. Did you hear any whistle blow at all? A. No, sir.

"Q. No whistle blown on either of the trains? A. No, sir.

"Q. Have you talked with this gentleman recently, George? A. Yes, sir.

"Q. How many times? A. About four times.

"Q. When did you talk to him last? A. Last Monday, I believe it was.

"Q. And you talked to him about three times before that, did you? A. Yes, sir.

"Q. About how Carl got killed? A. Yes, sir.

"Q. Now, you testified before the coroner, didn't you, sonny? A. Yes, sir.

"Q. Didn't you testify before the coroner that you heard a whistle blown, but that it was a whistle on the C. & A. freight train? A. Yes, sir.

"Q. You did hear a whistle blown then? A. Yes, sir, but I didn't hear any on the passenger; I just heard one whistle and that was on the freight.

"Q. How could you tell it was on the freight train? A. Because I seen the freight when it passed.

"Q. You say the freight went past about the time the passenger train struck Carl? A. Yes, sir; it was just about passing when the passenger struck him.

"Q. You say when Carl left you he started to go in a southwest direction? A. Yes, sir.

"Q. That was across the tracks? A. Yes, sir.

"Q. Across towards the corner of the Missouri Elevator building there? A. Yes, sir.

"Q. In a southwestern direction across these railroad tracks? A. Yes, sir.

"Q. You said he walked along one of the tracks? A. Yes, sir.

"Q. You testified before the coroner that he walked along the middle of the track? A. He went southwest first and then turned down the Missouri Pacific track.

"Q. Then he got off that track and started to go

across these others and saw this freight train coming?
A. Yes, sir.

"Q. And then when he saw this freight train com-ing he jumped back on the Missouri Pacific track?
A. Yes, sir.

"Q. And then the Missouri Pacific engine was there and struck him? A. Yes, sir.

"Re-Direct Examination by Mr. Scarritt.

"Q. How long was this freight train? A. It had eight or ten cars in it.

"Q. A regular freight train? A. Yes, sir.

"Q. Coming into Kansas City? A. Yes, sir.

"Re-Cross Examination by Mr. Robinson.

"Q. After he had walked along the track there and got off and started to go across the other tracks and saw that freight train, if he hadn't got scared and jumped back on the other track, he wouldn't have been struck, would he? A. No, sir."

Then follows a bit of testimony upon which much stress is placed by the plaintiff:

"Re-Direct Examination by Mr. Scarritt.

"Q. How long had Carl been back on the Missouri Pacific track after stepping back on it before the train hit him? A. Just about two minutes.

"Q. In which direction was he going? A. West.

"Q. Now, were you talking to him just before he was struck? A. Yes, sir.

"Q. What did you say? A. I said, 'Good-bye, Charlie,' and he turned around and said 'Good-bye,' and papa asked him if he was going home and he said, 'Yes.'

"Q. And then what happened? A. It struck him."

Counsel for defendant took out his watch and pen-cil, for the purpose of testing the question of the know-ledge of the witness as to what was in fact two minutes and witness told him when to stop, but this would indi-cate nothing to us in the present shape of the record.

It might have indicated much to the jury. Then follows:

"Q. You indicated a while ago when I held up my pencil how long you thought two minutes was? A. Yes, sir.

"Q. And Carl had been on the track about that long after he jumped back? A. Yes, sir.

"Q. And it was just after he jumped back that he said, 'Good-bye,' and you said, 'Good-bye,' he had just been on the track long enough for you to say 'Good-bye,' and he to say 'Good-bye,' when the passenger struck him? A. Yes, sir."

Alexander Kumpf, the old German, said:

"Q. Were you all coming down the road on the east side of the Heim property; were you walking in the road with the children? A. Yes, sir; they were pulling the wagon and I was picking up the wood, and all at once I looked ahead and seen Charlie Matz about fifty feet ahead of me and started right over the railroad, and I don't know—I hollered.

"Q. That is right at the street east of the brewery?

"Mr. Robinson: I object to that; Mr. Scarritt oughtn't to tell him what to say.

"The Court: Go ahead. He told the witness what it was.

"To which ruling of the court defendant duly excepted at the time.

"A. He turned around; he turned right over on the railroad, and he crossed the first switch and then went in the center from the main track.

"Q. Which way did he go then? A. To go home.

"Q. Well, which way? A. West.

"Q. Right in the main track?

"Mr. Robinson: I object to that, if the court please. I am going to protest every time Mr. Scarritt puts words into the mouth of the witness whether it is after the witness has made a response to another ques-

tion or before. I don't think it is the proper way to try the case. The witness ought to be permitted to tell in his own way what he knows.

"Q. Where did you go? A. I followed the wagon and my children pulled on it and some of the other children, I don't know who, and I say, 'Carl, you go home?' and he say, 'Yes' . . . . And then some of my children said to him, 'You go home?' and he said 'Yes, I have to hurry to go home.' And I said, 'Good-bye, sweetheart.' I just felt like that and every one of the children laughed and said, 'Good-bye, sweetheart,' and then I followed and seen them talking, and I came around this corner, then I seen him follow straight between them tracks, and then when I seen him going round to go west I seen him about fifty feet ahead of me towards the watch house.

"Q. What watch house is that? A. Where the street crossing is.

"Q. The little house where the watchman stays? A. Yes, sir.

"Q. Is that watchman's house there yet? A. Yes, sir; it is there yet.

"Q. A little house about six feet square; a little frame house? A. Yes, sir, and that is the last what I seen from him.

"The Court: You didn't see him hit? A. No, sir; I didn't see him any more. Then I picked up some wood. This was for winter time and I was crippled and I do the best I can, so I saw on the other side of the railroad a piece of coal and I went across, and when I went across I didn't hear any whistle at all. And when I went to pick up that piece of coal all at once a train came along and I had to jump back myself or I would be as dead as that child. And as soon as the train was past I heard my children crying, then I went across."

On cross-examination he further said:

"Q. Well, now, listen to my question; did you see two trains passing at that time? A. Yes.

"Q. And you thought it was the C. & A. train that came pretty near striking you? A. Yes, that is what I thought. I mean the train that came from the west, but I don't know exactly from all the excitement how it was; you know I was so all excited.

"Q. Now, listen; you say that Charlie Matz left your children and started to go home, and started to go across the railroad tracks? A. Yes, sir.

"Q. And he started across from the north side over in a southwestern direction towards the south side of the tracks? A. Yes, sir.

"Q. And you say he got on the Missouri Pacific track and walked a little ways up that track? A. Yes, sir.

"Q. And you went on then picking up wood? A. Yes.

"Q. And you were looking around for pieces of wood and you didn't notice Charlie any more until that train came pretty near striking you; is that right? A. Yes, sir.

"Q. And you then heard the children crying and you went over and saw his body?

"Q. And you don't know what he did from the last time you saw him until you jumped out of the way of that train? A. No, sir.

"Q. He may have got off that track and then jumped back on it again for all you know? A. Yes, sir; I don't know."

Such is the unsatisfactory state of the evidence in this case. We have set out the material portions in full so that a connected view, if possible, may be taken from it as a whole, when considered with the other circumstances and the surroundings.

I. In addition to the demurrer interposed at the close of the evidence for the plaintiffs, the overruling

of which is charged as error, the defendant asked an instruction in this language:

"The court instructs the jury that if you believe from the evidence in this case that the deceased got off of defendant's track and beyond the reach of danger of being struck by defendant's engine, and that, after having done so, he again came suddenly back on defendant's track just in front of defendant's engine, and so close to said engine that the same could not possibly be stopped in time to avoid the accident, then the plaintiffs are not entitled to recover and it is your duty as jurors to return a verdict for the defendant, notwithstanding you may further believe from the evidence in the case that the engine which struck the deceased was running at a speed of about eighteen miles an hour, or more, and although you may further believe that no bell was rung or whistle sounded on said engine when approaching the point where the accident occurred."

The refusal of this instruction was error. For the sake of mere argument on this point grant it for the plaintiff, that the evidence in some instances tends to show that the child was in the center of the main track for a sufficient length of time to have been discovered in time to have averted the injury, had ordinary care been used, yet it must be conceded that there is ample evidence in the record tending to prove that the boy had crossed the track and was near the C. & A. track, 14 feet to the south thereof, when he suddenly jumped back to this track in front of a rapidly moving engine and train. With such in the record, this instruction should have been given.

After discussing the degree of care which must be shown toward children and the proper gauge of their acts and as to what should be the rule as to them on the question of contributory negligence, the writer in 7 Am. and Eng. Ency. of Law, p. 409, says: "But this will not warrant a recovery when the child sud-

denly puts himself in a dangerous place where there was no reason to expect him, and too late for the danger to be averted by the person inflicting the injury."

This case proceeds upon the humanitarian doctrine. Plaintiffs so limit it in their one instruction. That doctrine has for its origin a concession of negligence contributing to the injury upon the part of the injured or deceased. In this State we have no such thing as comparative negligence, and further if the negligence of both operate together to produce the injury, there is usually no liability, except for what we denominate the humanitarian or last-chance doctrine. By this we mean, that although the injured party may have been guilty of negligence, by placing himself in a position of peril, yet if the defendant by the exercise of ordinary care did see him in such position, or by the exercise of such ordinary care could have seen him in such position, in time to have averted the injury, then the defendant is liable.

In this case, the deceased was but a licensee at best, and entitled to such care only as would be due a licensee of his years. If it is true that deceased was across the main track of defendant, and if it be granted there was the imposed duty upon defendant's agents to look for licensees at the point of injury, then if the engineer looked when he was 1,200 feet or more to the west, he probably saw this boy on his track and then later leave it and start south, and under such circumstances he had a right to expect that he would continue on his journey and not suddenly return to a place of danger. If he did suddenly return to a place of danger the defendant was entitled to the instruction asked. It is not so much the question of negligence on the one side and contributory negligence on the other, as it is, what was the proximate cause of the injury? The humanitarian doctrine had its origin in conceded negligence. If both parties were negligent,

which contributed to and produced the injury, there could be no recovery, except on the theory of imminent peril recognized by the humanitarian doctrine. If on the other hand the injured party alone was negligent there could be no recovery except upon the principle of humanity expressed in the humanitarian rule. This rule depends upon the fact that the defendant did see the peril of the injured party, or by the exercise of ordinary care to see (in places where the party might be expected, and had a right to be), could have seen him, in time to have averted the injury. The case at bar is quite different from the case of Holmes v. Railroad, 207 Mo. 149, for there the boy was going toward the track, and had the engineer looked he would have so seen. Here had he looked he would have seen the boy going from the track. What would be demanded of defendant in the Holmes case would not be demanded of it here under the evidence we are now discussing.

In King v. Railroad, 211 Mo. l. c. 13, we said: "If the deceased was in a place of safety, and placed himself by inadvertence or otherwise immediately in front of a moving train or engine, and was thereby injured, the defendant is not liable. In other words, if the conduct of deceased, in a place of safety, was such that he put himself so suddenly in a place of danger that the accident could not have been avoided, even if the defendant had complied with the ordinance in the strictest terms, then the plaintiff cannot recover on the bald proposition that the defendant had not complied with the ordinance. In such case, the failure to comply with the ordinance would not be the proximate cause of the injury. The cause of the injury would be the inadvertent act of deceased in taking the step from a place of safety to one of danger. The evidence tends to show that this change was but the work of an instant, thereby furnishing no time for warning."

So there is ample evidence that the reappearance of the boy on the track was but the work of an instant. The refusal of the instruction above set out is prejudicial error.

II.   It is in a way insisted that defendant has waived the right to insist upon the demurrer offered at the close of plaintiff's case, by not renewing it at the end of the whole case where the defendant introduces evidence. In this case, the defendant introduced but one witness. If the plaintiff had failed to make a prima-facie case in the first instance, the evidence of this witness did not add to the case. The failure to give the demurrer is urged in the motion for a new trial as error. It is also urged in that motion that: "The verdict is against all the evidence in the case, and upon the undisputed evidence the verdict should have been for the defendant."

In our judgment, the better practice is to renew the demurrer at the end of the whole case, but in a case where there has been no aid to the prima-facie case by the subsequently introduced evidence, we can see no reason, in our practice, for not considering such demurrer, where it is urged as error in the motion for new trial. It challenges the sufficiency of the evidence at a certain point, and if no additional evidence is brought forth, it in fact challenges the whole case.

But aside from that, the sufficiency of the whole evidence is challenged in the motion for new trial in the clause therefrom quoted above, so that from whatever source we consider the challenge to the sufficiency of the evidence, we must examine this evidence, and pass upon its probative force.

III.   It is hard to discard one's sympathies in a case of this kind. Here we have parts of three families approaching this network of railroads. There was no necessity for any to cross them except the

little fellow who was killed. Evidently they all lived an humble life. Carl, the deceased, left them at some point after they got to the southeast corner of the brewery property. Then, with childish glee, he started to angle across this network of railroad tracks. He had three little fish that he was taking home. The description of the parting, when the ''Good-bye, sweetheart,'' was said to him by the old man and his other little playmates, in view of what followed so shortly, is almost heartrending.

With care we have read and re-read this evidence. With the map and other admitted facts we can reach some conclusions as to its probative force, and this we should do irrespective of the sympathetic feelings aroused by the kindly and affecting incidents just prior to the fatal moment. From what we have quoted it appears that the trial court was exceedingly lenient in relaxing the strict rules of evidence in the course of the trial. That court evidently considered the age of the witnesses on the one hand, and the inability of the old German, Kumpf, to fairly understand and describe things, upon the other. Whether right or wrong the plaintiffs had the benefit of this leniency, and in the appellant's briefs here the specific grounds of error in this regard, if error there was, is not pointed out to us, and we owe no special duty to point them out or seek for them. In view of the fact that the case must be at least reversed and remanded, and of the further fact that if we should reverse and remand simply it might be construed that we were of opinion that there was in fact a case upon the facts, we will take up this evidence and indicate our views thereon.

From it we conclude that the deceased left his friends and started to cross these railroad tracks at some point east of Chestnut Avenue. This is shown by all the witnesses. The ''Good-bye, sweetheart,'' that was said to him, evidently occurred at the point of separation, and this was where the little wagon was on

Guinotte Avenue.  Mr. Kumpf says he looked up and
saw him ahead and "hollered" to him, and then details
the incident of separation.  He then said his children
proceeded toward the west, and Carl toward the watch-
man's house, which would be southwest.  That he then
began to pick up wood and finally went after a lump of
coal.  That whilst doing this two trains suddenly ap-
peared going in opposite directions.  That he had to
jump back to save himself, from what he judged was
the C. & A. train going west.  That after the other
train passed, hearing the distressed cries of his chil-
dren he went across and found Carl dead. To our mind
this shows that in his search for coal and wood he had
reached the C. & A. track.  The last he saw of Carl he
was going up the Missouri Pacific track, but he did not
see him just prior to the accident.  The other little
fellows all agree that Carl jumped back from one track
to dodge a train and was caught on the other track
by defendant's train.  This could only mean that he
left the C. & A. track and was caught on defendant's
track.  The old man says that the two trains were
there practically at the same time.  To our mind the
only bit of testimony lending color to a case for the
plaintiffs is the following brought out on a re-direct
examination:

"Q.  How long had Carl been back on the Mis-
souri Pacific track after stepping back on it before the
train hit him?  A.  Just about two minutes.

"Q.  In which direction was he going?  A.  West.

"Q.  Now, were you talking to him just before he
was struck?  A.  Yes, sir.

"Q.  What did you say?  A.  I said, 'Good-bye,
Charlie,' and he turned around and said, 'Good-bye,'
and papa asked him if he was going home and he said,
'Yes.'

"Q.  And then what happened?  A.  It struck
him."

Emphasis is given to the question of two minutes. They urge that if he had been there two minutes, the servants of defendant had opportunity to discover him and give him warning.   This statement of the little boy, George Kumpf, should be closely · scrutinized. His age and parentage should not be forgotten.   He had just been describing the course of the party from the little fish pond to the death of his little playmate. He speaks here of bidding little Carl good-bye.   In that, he evidently referred to the time. they separated just before Carl started across for home—just before he started across the·tracks.   The time of the separation and the accident was short.   In our judgment, he, as to the two minutes, was referring to that space of time which intervened   between the parting of the parties and the accident.   The question, "Now, were you talking to him just before he was struck?" and the answer "Yes, sir," was literally true, but taken with all the witness has detailed, referred to the first and in our judgment the only parting and separation of the parties, when they all told Carl good-bye.  So considering it there is no force in the contention of plaintiffs.

I am of opinion that there is no redress for this unfortunate accident, for accident I think it was.  So viewing the evidence, the cause should be simply reversed.  It is so ordered.  All concur, except *Lamm, J.*, who thinks the judgment should be reversed and the cause remanded.