# GEORGE W. ELLIS and ELIZABETH ELLIS v. METROPOLITAN STREET RAILWAY COMPANY, Appellant.

### Division One, June 1, 1911.

1. **NEGLIGENCE: Humanitarian Rule.** The humanitarian rule is a doctrine of the law, which, in one of its phases, casts liability upon a negligent street railway company whenever its servants, operating its car on a public street, see, or by the exercise of ordinary care could see, a traveler in danger from the going car, and thereafter fail to exercise ordinary care in the use of means at hand to avoid injuring him, when such ordinary care, having regard to the safety of the passengers, would have saved the traveler.

2. ———: ———: **Reasonable Apprehension: Concurrent Negligence: Question for Jury.** A necessary complement of the foregoing rule is that, when a traveler in the street, out of danger, negligently moves from his place of safety to one of danger from an oncoming car, so close to it and under such circumstances that his danger cannot be reasonably apprehended by those in charge of the car in time to save him by the exercise of ordinary care, then the negligence of the traveler is either the proximate cause of his own injury, or, in case the element of defendant's negligence be also present, then the negligence of the traveler and the negligence of the defendant carrier are coincident and concurrent—in neither of which hypotheses is there any room for the application of the humanitarian rule; and if in a given case the facts are so plain that, average fair-minded men cannot reasonably differ about it, a recovery of damages may be denied as a matter of law. But if there is a ground for fair difference of opinion about the facts going to establish either hypothesis, then the question is for the jury.

3. ———: ———: **Vigilant Watch for Travelers.** The duty of a vigilant watch for travelers about to cross the track rests upon the motorman of a street car, and he is held to have seen what he might have seen. What one knows and what he ought to know are equivalent.

4. ——— ———: ———: **Apprehending Danger to Traveler Not Looking.** Although the driver of the wagon was chargeable with negligence in not looking towards the oncoming car as he approached the track, yet if there is evidence tending to show that the motorman was running his car without such vigilant

234 Sup.—42

concern and watchfulness as the law imposes upon him to avoid injuring those coming within its danger zone—that if he had been looking ahead he would have seen the driver, with his back to the car, slowly verging towards and then entering the track over the diagonal crossing, in an attitude of evident obliviousness to the approach of the car and intent on crossing the track; that the motorman had his face turned in another direction; and that the car could, by the use of ordinary care, have been stopped in time, after the driver's danger was obvious, to have let him cross in safety—the liability of the defendant company is a question for the jury to settle.

5. ——: ——: **Stopping Car: Expert Testimony.** Where the motorman testifies he stopped the car in from twenty-five to thirty-five feet after he applied the brake, and his testimony is strongly corroborated by other witnesses, the mere advisory testimony of defendant's experts to the effect that it could not be done, in the face of the fact that it was done, presents no case for judicial interference.

6. ——: ——: ——: **Reasonable Opportunity to Stop Car.** Where the horse and wagon were nearly nineteen feet in length and were moving slowly and the car struck the hind rim of the hind wheel, it is a question for the jury to say whether or not a car going from six to eight miles per hour could, by the exercise of ordinary care, have been stopped, after the driver's peril was obvious to a seeing motorman, in time to avoid injuring him, where the motorman and others testify the car was actually stopped within twenty-five to thiry-five feet after he applied the brakes.

7. **INSTRUCTION: Error Common to Both Sides.** Defendant cannot on appeal complain that the instructions of plaintiffs in the negligence case against defendant railway company, used the word "tracks" instead of the singular form "track," if its own instruction asked and given, or its instruction asked and refused, used the same word "tracks." The trial theory of a case attends it on appeal, and error common to both sides is not reversible error.

8. ——: **Negligence: "Tracks" Instead of "Track."** It was not error to use the word "tracks" instead of "track," in the clause in the instruction, "If you further find from the evidence that in crossing said tracks said deceased driver was in a perilous situation," etc., where the tracks were close together, the car was on the south track, the driver was driving his horse southward, and while he was within the apprehension of the motorman his horse was on the south track and his wagon on the north track.

9. ——: **Assuming Admitted Fact.** It is not reversible error for the instruction to assume as true a fact conceded or assumed as true by the adversary party.

10. ——: **Excluding Unwarranted Hypothesis.** Nor is it error for the instruction to exclude a hypothetical theory which is not within the evidence. Where there is no evidence that deceased, in crossing the street railway, looked and saw the oncoming car and in racing with death lost the race, it is not error for the instructions to omit all reference to such hypothetical theory of his death.

11. ——: **Too Favorable to Defendant: Contradictory.** An instruction too favorable to appellant, though contradictory of respondent's correct instruction, is an error of which appellant cannot complain.

12. ——: **Humanitarian Rule: Traveler's Negligence Proximate Cause of Injury.** An instruction for the defendant street railway company, telling the jury that if the deceased traveler, in attempting to cross the track in front of the oncoming car, "was negligent and such negligence directly contributed to his death, then there can be no recovery herein and your verdict must be for defendant"—if it means that the prior negligence of the traveler in going upon the track without looking to see if a car was approaching, defeats recovery, although defendant's servants in charge of the car, by the use of ordinary care to discover his peril and to slacken the car or stop, might have avoided hitting his wagon—had no place in the case under the humanitarian rule, and should have been refused. But if the instruction, when read in connection with others given which correctly formulated the humanitarian rule, means that if the traveler went on the track heedlessly in such close proximity to the oncoming car that he could not have been saved by the exercise of ordinary care, there can be no recovery, it was a good instruction, and not contradictory of the others.

13. ——: ——: **Traveler on Track: Danger Zone.** The duty of the motorman in charge of a street car approaching a crossing to keep a vigilant watch for a driver of a wagon about to cross the track without looking, does not commence when the horse's feet are actually on the track; it commences at such time as a prudent motorman can see that the driver, oblivious of his danger from the car, is intent on pursuing his journey across the track.

14. ——: ——: **Oblivious Traveler.** Where there is evidence tending to show to a reasonably prudent person that the traveler, unconscious of his danger, was apparently intent on continuing his journey on and over the track, an instruction telling the jury that the motorman of the oncoming car had the right to assume, when he saw the traveler approaching the track,

that he would stop and not go on the same, and that he owed no duty to give warning or to either stop or check the car until there was actual danger of a collision, should be refused.

15. ——: ——: **Not Looking or Listening.** A mandatory instruction to find for defendant if the jury believe from the evidence that the traveler on a public street, in crossing the track, did not look or listen, when by looking he could have seen, or by listening he could have heard, has no place in any case to which the humanitarian rule is applicable.

16. ——: **Giving Same Twice.** Where the jury were told in one instruction given for defendant that, although they found the bell was not sounded, such fact would not warrant a verdict for plaintiffs, it was not error to refuse another instruction asked by defendant telling them that there was no evidence that a failure to ring the bell was the proximate cause of the accident, and recovery would not lie on that ground.

17. **EVIDENCE: Negligence: Locus in Quo: Street Crossing.** Evidence that the place where the driver of the wagon attempted to cross the street car tracks was the only crossing for some distance, that the paving was green and the excavation by the city for pavement further down the street was going on, is competent, as throwing light on the correlative issues of negligence and contributory negligence, although the street railway company had no control of the action of the city in constructing the pavement or crossing.

18. ——: ——: **Sounding Bell: Within Scope of Averments.** Where the petition alleged that "no proper warning was given deceased of the approach of said car," testimony tending to show that no bell was sounded as the car which struck the hind wheel of deceased's wagon approached the crossing, was material and within the issues. Under the humanitarian rule, if the motorman can warn and thereby save injury to a crossing passenger, it is his duty to warn.

19. ——: **Speed of Car: Competent Witness.** One who has observed the running of street cars in the city, and saw the speed of the car which struck the traveler, is qualified to put an estimate upon its speed.

20. ——: ——: **Stopping Car: Expert's Qualification: Not for Decision: No Difference in Testimony.** A witness who has worked for defendant as a motorman on the street in question for eleven weeks on the same character of car and is familiar with the equipment shows such experience as to justify the court in submitting his opinion of the distance in which a car of a given speed, equipment and load, on a given grade and condition of track, may be stopped. But where his opinion nearly agrees with the testimony of defendant's witnesses as to

the distance in which the car was actually stopped, it is scarcely necessary to determine whether or not he was an expert. Where the car actually stops within a certain distance, there is no need of theorizing upon inability to stop within that distance.

21. ———: **Disposition to Settle Meritorious Claims.** Testimony that the custom of the defendant street railway company was to investigate the cause of accidents, for the purpose of determining whether or not its employees were at fault, and upon that determination to adjust cases wherein it found itself at fault and to decline to settle when not in fault, was properly excluded, although the plaintiffs' counsel, in the cross-examination of defendant's claim agent, had shown by him that he had investigated the accident in question, interviewed the witnesses, and was instrumental in taking sworn statements from some of them. The benevolent custom of defendant is a collateral matter, and not a part of the real issues.

22. **REMARKS OF COUNSEL: Inexperience of Motorman.** Where the petition charged that the negligence of plaintiff's son was caused "by the negligence, unskillfulness of defendant's servants," and the evidence shows the motorman had been in charge of the car about one week and in actual service about half that time, it was not error to permit plaintiff's counsel to comment on his inexperience and lack of qualification, in his argument to the jury, nor was it error to refuse an instruction asked by defendant telling the jury that the experience or inexperience of the motorman is not an issue in the case and to exclude from consideration all remarks made by counsel in regard thereto.

23. **EXCESSIVE VERDICT: $8000 for Death.** Since the statute permits a verdict between $2000 and $10,000 for death due to the negligence of defendant, and leaves it to "the discretion of the jury" to fix the amount between that minimum and maximum, it will not be held that a verdict for $8000 was excessive and the product of passion and prejudice, where there is no untoward matter reasonably invoking judicial discretion.

Appeal from Jackson Circuit Court.—*Hon. Henry L. McCune,* Judge.

Affirmed.

*John H. Lucas* for appellant.

(1) The court erred in refusing to give defendant's demurrer offered at the close of plaintiffs' evi-

dence and renewed at the conclusion of all the evidence. Reis v. Transit Co., 179 Mo. 7; Holland v. Railroad, 210 Mo. 350; Degonia v. Railroad, 224 Mo. 599; Boring v. Railroad, 194 Mo. 552; Guyer v. Railroad, 174 Mo. 344; Roenfeldt v. Railroad, 180 Mo. 565; Van Bach v. Railroad, 171 Mo. 346; Sikes v. Knott, 197 Mo. 714; Hawkins v. Railroad, 135 Mo. App. 535; King v. Wabash, 211 Mo. 14. (2) The court erred in giving instruction for respondents. King v. Wabash, 211 Mo. 114; Matz v. Railroad, 217 Mo. 300; Degonia v. Railroad, 224 Mo. 587; Ross v. Railroad, 132 Mo. App. 479; Wallack v. Transit Co., 123 Mo. App. 167; Graffe v. Transit Co., 224 Mo. 261; Crowe v. Railroad, 212 Mo. 610; Swearingen v. Railroad, 221 Mo. App. 660; Percell v. Railroad, 126 Mo. App. 53; Budd v. Hoffheimer, 52 Mo. 297; Houck v. Railroad, 116 Mo. App. 559; Heinzle v. Railroad, 182 Mo. 559. (3) The court erred in refusing to give instructions for appellant. Veatch v. Railroad, 129 S. W. 404; Felver v. Railroad, 216 Mo. 210; Weigman v. Railroad, 223 Mo. 713; Stottler v. Railroad, 204 Mo. 619; Brockschmidt v. Railroad, 205 Mo. 435; Houck v. Railroad, 116 Mo. App. 559; Heinzle v. Railroad, 182 Mo. 559. (4) The counsel for respondents being guilty of misconduct, the court erred in refusing to reprimand and in refusing to give instruction 18 asked by appellant. Eppstein v. Railroad, 197 Mo. 738; Haynes v. Trenton, 108 Mo. 133.

*T. J. Madden* for respondents.

(1) That the demurrer to the evidence should not have been sustained. White v. Railroad, 202 Mo. 539; Waddell v. Railroad, 213 Mo. 8, is very much in point. Felver v. Railroad, 216 Mo. 195; Dahmer v. Railroad, 136 Mo. App. 443; Eckhard v. Transit Co., 190 Mo. 593; Grout v. Railroad, 125 Mo. App. 552; Cole v. Railroad, 121 Mo. App. 605; Beier v. Transit Co., 197 Mo. 125; Schafstette v. Railroad, 175 Mo. 142; McKenzie

v. Railroad, 216 Mo. 1; Moore v. Transit Co., 194 Mo. 1; Kinlen v. Railroad, 216 Mo. 145; Murry v. Transit Co., 108 Mo. App. 510; Eckhard v. Transit Co., 190 Mo. 593; Bárrie v. Transit Co., 119 Mo. App. 38; Holmes v. Railroad, 207 Mo. 149; Holden v. Railroad, 177 Mo. 469; Goff v. Transit Co., 199 Mo. 694; Beier v. Transit Co., 197 Mo. 215; O'Keefe v. Railroad, 124 Mo. App. 613; Wise v. Transit Co., 198 Mo. 546; Richmund v. Railroad, 123 Mo. App. 495. (2) The use of the plural "tracks" could not have misled the jury, for it is qualified so as to limit the situation of peril to the "danger of being struck by said car." The use of the plural "tracks" was proper because the horse and wagon were on both tracks at a time when the boy was in a situation of peril. It is also objected that the instruction assumes that the boy was not aware of the approach of the car. No such assumption is made in the instruction. But even if it did assume that he was unaware of the approach of the car it would not be error. All the evidence, without a single exception, showed that he was unaware of the car's approach. This instruction is identical with those given in the leading cases. Waddell v. Railroad, 213 Mo. 8; Matz v. Railroad, 217 Mo. 275; Kinlen v. Railroad, 216 Mo. 145; Felver v. Railroad, 216 Mo. 195. (3) Instruction two was supplemental to and explanatory of instruction one. The jury might have received the impression from instruction one standing alone that the motorman was under no duty to take precaution to avoid the collision until the boy was actually upon the track, which of course, is not the law, and plaintiffs were entitled to a proper statement of the motorman's duty. It was his duty to take precaution to avoid the injury after it became apparent that deceased was going upon the track. Barrie v. Transit Co., 119 Mo. App. 52; Murray v. Transit Co., 108 Mo. App. 510; Eckhard v. Transit Co., 190 Mo. 617; Holden v. Railroad, 177 Mo. 469. (4) The ringing of the bell was one of the means that the mo-

torman could have used to avert the collision.  Proper warning would have prevented his entry upon the track or hastened his leaving it.  It has been held that the failure to sound the bell may make the defendant liable under the humanitarian doctrine.  Klockenbrink v. Railroad, 172 Mo. 690; Moore v. Transit Co., 194 Mo. 11; Reyburn v. Railroad, 187 Mo. 572; Riska v. Railroad, 180 Mo. 184; Mann v. Railroad, 123 Mo. App. 486; Kinlen v. Railroad, 216 Mo. 145; Waddell v. Railroad, 213 Mo. 8; Kinlen v. Railroad, 216 Mo. 145; Felver v. Railroad, 216 Mo. 195.

LAMM, J.—Plaintiffs sue defendant for the statutory penalty of $10,000, for the death of their minor son, Carl, grounding their action on negligence.  A verdict came in for $8000, and from a judgment on that verdict defendant appeals, assigning error as follows:

(a).  In refusing defendant's demurrer at the close of plaintiff's case and again at the close of the whole case.

(b).  In giving plaintiff's instructions 1 and 2.

(c).  In refusing instruction 7, 9 and 12 for defendant.

(d).  In ruling on the admission of testimony.

(e).  In ruling on the language and conduct of plaintiff's counsel in his concluding argument to the jury.

(f).  In overruling the motion for a new trial (and herein that the verdict is excessive and indicates passion and prejudice).

Any record needful to make plain and determine assignments b, c, d, e, and f will appear when considering them in the course of the opinion.

As to assignment a it calls for a summary of the pleadings and facts, viz.:

*Of the pleadings.*

The petition charges that defendant is a corporation owning and operating a street railway system in Kansas City, including a line on East Fifteenth street, run by electricity, each car manned by a motorman and conductor; that said street was a public street; that defendant owed certain duties to keep from injuring persons using the street; that Carl Ellis was unmarried, the child of plaintiffs (who are husband and wife), aged about fifteen years; that while Carl, at about ten o'clock a. m. of September 5, 1906, was driving a delivery wagon eastwardly on said street where it intersects Bristol avenue, his wagon was run into by one of defendant's cars and he was killed by the negligence of defendant's servants and employees, viz., in not keeping the car under proper control, in not keeping a proper outlook for persons in a position of danger, in not giving proper warning to the deceased of the approach of the car and in not making proper effort to stop the car or reduce its speed as it approached the deceased. The petition next states a ground of recovery under the humanitarian rule in that defendant, its agents, and servants, failed to exercise ordinary care in the use of the means at command to avoid injuring the boy after they either discovered him in peril or by the exercise of ordinary care should have discovered him in or going into a situation of peril.

The answer was a general denial, coupled with a plea of the contributory negligence of deceased.

No reply is shown by the record, but the trial proceeded as though one had been filed.

*Of the facts.*

Fifteenth street runs east and west in Kansas City. Bristol avenue runs north and south, stopping at Fifteenth. Winchester runs north and south, and cuts Fifteenth street at right angles a block (300 feet) west of Bristol. The place of the accident was the intersection of Bristol and Fifteenth if the former had

been projected further. We will call it the ''intersec-tion.'' Up to the time in hand, Fifteenth street had not been paved from curb to curb. On that street two street railway tracks were laid, on which defendant operated street cars by electricity. The eastern ter-mini of these lines were a few blocks east from said intersection. At and some little while before the ac-cident a scheme for partially paving 15th was being carried on. As we grasp it, that scheme was to pave the tracks and between the tracks with a margin on either side with brick. In order to do that, excavation was necessary, and the dirt taken out, thrown to either side of the tracks, somewhat interfered with travel. Bricks had been laid and heeled into the sand from the east up to Bristol. From Bristol on west the pave-ment was not so far advanced, but was in progress. The excavation continued on west and gangs of men were at work at intervals in the street from Bristol west to Winchester and beyond. Half bats and quarter bats were to be fitted into the interstices of the pavement, and then it was to be rolled and cement slush poured on to complete it. In the condition of things existing on September 5, 1906, it was not practical for teams and wagons to cross from one side of Fifteenth to the other in the neighborhood of the accident for several blocks, except at one point, namely, at said intersec-tion. There loose bricks had been roughly laid, making a street crossing diagonally over the tracks—said crossing running from the northwest to the southeast. That crossing had been put in some two or three days before the accident and, as said, was the only available one.

Plaintiff, George W. Ellis, kept a transfer barn on the south side of Fifteenth street, about a half block east of said intersection. He owned and operated therefrom express wagons, and one of those wagons was in charge of his son Carl. Carl Ellis was about fifteen years old and had for about a year worked for

his father, after school hours and during the summer
school vacation, in driving an express wagon and deliv-
ering parcels for hire. Before noon of September 5,
1906, he was driving on old, slow-traveling, stiff horse
to a heavy one-horse express wagon. He had been out
to the northwest plying his avocation, and, in coming
back to his father's barn, drove to Winchester, came
down that street to Fifteenth, turned there, drove on
the north side of Fifteenth down to the intersection,
there undertook to cross on said temporary brick cross-
ing southeastwardly to the south side of Fifteenth,
heading for his father's barn. He was an average-
sized boy for his age and presumably of average in-
telligence. His horse and wagon, were eighteen feet,
three inches from the nose of the horse to the back
rim of the hind wheel. The street car tracks were five
feet apart and presumably were of the ordinary width
from rail to rail. One witness testified that the boy
approached the crossing with his horse in a "dog trot."
But there is much testimony to the effect that he turned
and drove diagonally over on the first track, crossed
the interval between the tracks, then on to the south
track in a slow walk, looking steadily to the southeast
in the direction he was going. No eye witness (and
there were several of them) saw him look to the west
for an approaching car at any time. There was testi-
mony tending to show that the crossing being rough
a driver needed to pay attention to his driving. Carl
had the lines in his hands and apparently was paying
attention to his driving and nothing else. He pro-
gressed so far across the south track that his horse
and front part of his wagon were over, and an instant
more would have cleared him when an east-bound car
struck the hind rim of his hind wheel, upsetting his
wagon and throwing him to the track. He was crushed
by the car and mortally hurt, dying the evening of the
same day without recovering consciousness. There
was a down grade commencing some blocks west on

Fifteenth and extending east beyond the intersection. The car killing him carried three passengers, was in charge of a motorman and conductor, was an open car, about thirty feet from bumper to bumper and was equipped with brake and reverse. In the neighborhood of the Winchester crossing and a little east gangs of men were at work along the track and the car slowed down at that point to a speed of about four miles per hour. . When it passed Winchester, its power was fed and its speed increased to about seven or eight miles per hour. We take it, it coasted east down grade on its own momentum at that speed until it struck the wagon. There was testimony on behalf of plaintiff from eye witnesses that the speed of the car did not slacken until at the time or about the time of the collision, and that no gong or bell was rung. There is testimony on the part of defendant that the motorman was sounding his bell with his foot from Winchester down to the Bristol crossing. The track was dry and there were no obstacles in the way of the motorman's seeing the boy driving to, on and over both tracks. Conversely, if the boy had looked westwardly, he could have seen the car approaching. There was testimony on plaintiff's behalf that the motorman was not looking ahead of him as he approached this crossing, but that his face was to the northward, as if talking to someone in the car door or in the car. Defendant's testimony was to the contrary. It was affirmed on one side and denied on the other that a passenger on the car hallooed to the motorman before the collision. Plaintiff, George Ellis, had been sick, was standing in his barn door, saw his son turn from Winchester into Fifteenth street. He took his eyes from him and turned around and took a seat in a chair, sitting there with his head drooping. Presently, he looked up and saw the car from ten to fifteen feet from the wagon, with the motorman looking towards the north and not noticing the way he was going. That fact excited witness and

caused him to arise from his chair. The motorman jumped to his brake when the car hit the wagon and he (the father) testified the motorman had made no effort to stop before that. A young lady was on the north side of Fifteenth at the intersection. She had noticed the car and wagon west of her. When the wagon was about to make the turn over the tracks, she noticed the car was about two-thirds of the way up toward Winchester. As she intended to cross at the same place, she let the wagon precede her and utilized the time to stoop to tie her shoe. She was tying her shoe when the car struck and she looked up and saw nothing at that instant bearing materially on defendant's liability. One of plaintiff's witnesses testified that as the boy was driving in a slow walk, holding his lines up, and the horse stepped on the south track, the car was eighty feet away as the witness estimated it. This witness also said he saw the motorman's head turned towards the north as the car approached the place of the collision, as though talking to someone in the car door. He testified the brake was put on just as the car struck the wagon and that it then ran some eighteen to twenty feet and stopped. (Note: There were some discrepancies between the statements of this witness in chief and in cross-examination, and some differences between his testimony on the stand and his written statement made to defendant shortly after the accident. The same remark justly applies to the testimony of some other witnesses introduced by plaintiff. But we need not particularize, because such differences and discrepancies were peculiarly a matter for the jury and not for an appellate court on demurrer to the testimony.) Another of plaintiff's witnesses estimated that the car was from forty to fifty feet away when the horse stepped on the south track. That witness was the passenger, Mr. Kassimer, who said he halloed to the motorman when he saw the boy in danger. Among other things, he testified the motorman

did not start to tighten his brake until about to strike the wagon, and that he hallooed before the car struck the wagon, and up to that time the motorman had made no attempt to stop the car. The car, as he saw the matter, struck the hub of the hind wheel and then ran about eighteen or twenty feet. The boy was seventy-five or eighty feet from the car when he started across the street, and witness hallooed when the car was about twelve to fifteen feet from the wagon, and the motorman then started to reach for his brake. Plaintiffs also put in evidence to the effect that a car of the size and equipped as this one, on a track with a grade and conditions there existing, could be stopped from eighteen to twenty-five feet, if going at the speed testified to by some of the witnesses. But if stopped in that distance, it would have to be under control, that is, the slack would have to be taken up so that the brake shoe would at once respond to the brake wheel when tightened. If the car was not under control and the brake was entirely off, the motorman would have to take about three movements to tighten it up. There is no material difference between witnesses for plaintiffs and defendant as to the speed of the car.

Defendant put in evidence from one witness to the effect that a car under existing conditions of track, load, grade, equipment and speed, could be stopped in one hundred feet. The conductor locates himself in the rear vestibule, and testified that his attention was first attracted by the sudden stop of the car, he felt the jolt, looked up and saw the motorman busy with his brakes. He had not seen the boy before that. The car ran thereafter probably fifteen feet, until it hit the wagon and then ran five or ten feet. This witness stated the car hit the wagon about the center. Another of defendant's witnesses testified the car ran twenty feet after it struck the wagon. The motorman of the car testified for defendant that he was in position in the front vestibule, looking out east in front of him.

He denied he was looking to the north, as claimed by some of plaintiff's witnesses, and said he was ringing the gong with his foot. He noticed the boy "just as he started on the track," could not say he had noticed him before that, could not say how fast the horse was going or whether in a slow or fast walk, could not say how far ahead of the car the horse went on the track. He applied the brake "as quickly as he [the boy] drove on the track." He estimated that the car ran from twenty-five to thirty-five feet after he applied the brake. Defendant introduced testimony from one expert to the effect that it would take from seventy-five to one hundred feet to stop the car under existing conditions, if going at eight miles an hour, and from fifty to sixty feet if going at six; and, from another expert, that the car could be stopped in from seventy-five to ninety feet.

The foregoing is an outline of so much of the evidence as bears vitally on the demurrer.

I. The case was put to the jury by plaintiffs in their instructions alone on the humanity rule. That rule is a doctrine of the law, which, in one of its phases, casts liability upon a negligent street railway company whenever its servants, operating its car on a public street, see, or by the exercise of ordinary care could see, a street traveler in danger from the going car, and thereafter fail to exercise ordinary care in the use of means at hand to avoid injuring him, when such ordinary care, having regard to the safety of passengers, could have saved the traveler. While negligence always has misfortune for a companion, yet such traveler does not alone bear the burden in the law of that misfortune when he inadvertently goes into a place of danger from a street car so far ahead of it that those who control it may, under the circumstances and conditions given in the rule, save his limb or life. The joint right in the carrier under its easement and fran-

chise, and in the traveler under the easement in the public, to use a public street, coupled with correlative and present duties of all those who use the street to each other, result in the above sensible and settled working theory for the administration of justice between the street traveler and the carrier.

Plaintiffs' counsel cite a line of cases supporting that theory. As we gather the run and import of his argument, learned counsel for defendant relies on an array of cited cases, which, he argues, in effect announce another or modified doctrine. We will not expand this opinion by quoting from either array. They will be found following the head notes in the summary of the briefs prepared by our reporter in the printed case, and the inquirer may consult them.

We leave the proposition with these observations: It will be found on analysis that the discord in the cases so marshaled against each other is more seeming than real. In the present state of the law, there can be little controversy about it. The trouble is in applying it to the varying facts of the individual case.

The rule stated, of course, has its necessary complement, viz: When a person, out of danger, negligently moves from his place of safety to one of danger from an oncoming street car, so close to it and under such circumstances that his danger could not be reasonably apprehended by those in charge of the car (who see or might see his peril) in time to have saved him by the exercise of ordinary care, then the negligence of the traveler is either the proximate cause of his own injury, or, in case the element of defendant's negligence be also present, then the negligence of the street traveler and the negligence of the carrier are coincident and concurrent—they (excluding the idea of comparative negligence) may be said to balance or offset each other. In either of which hypotheses there is no room at all for the application of the humanity rule. If a given case in that regard is so plain that

average fair-minded men cannot reasonably differ about it, a recovery may be denied as a matter of law. That result has been reached in many cases cited. But if there is a ground for fair difference of opinion about it, then the question is for the jury. We think that at bottom much of the apparent discord between the cases cited for defendant and those cited for plaintiffs disappears when the facts in each adjudged case are rigidly subjected to the foregoing test.

Assuming that Carl Ellis was *sui juris* and had arrived at an age chargeable with negligence for not looking westward as he approached the track, yet there was evidence tending to show that the motorman was running his car without such vigilant concern and watchfulness as the law imposes upon him to avoid injuring those coming within its danger zone. There was evidence that if he had been looking ahead of him he would have seen the boy with his back to the car slowly verging towards and then entering upon the track, in an attitude of evident obliviousness to the approach of the car and intent on crossing the track in front of it, heading towards his father's barn. There was evidence tending to show that a car drifting down grade, with the equipment, size and load of this one and running on a track in the condition of this track, could have been stopped or checked in time, after his danger was obvious, to have let the boy cross in safety. As the duty of vigilant watch rested on the motorman, he is held to have seen what he might have seen. It is axiomatic that what one knows and what he ought to know are regarded in law as equivalent.

If it be said that plaintiffs' testimony, directed to showing that the motorman was not looking ahead, was slight, yet there was evidence of that sort, the weight of which was for the jury under their oaths as triers of the fact and not with us, who, sitting as a court of errors, deal in the main with the law, and

when we enter the realm of fact in a law case have but one function, namely, to say whether there was any substantial evidence to establish the fact itself.

But the evidence as a whole in the controverted question of negligence on the motorman's part was not slight. The motorman's testimony has to be reckoned with on the last demurrer, and his testimony lends no little support to his negligence. All sides agree that the horse was moving slowly. It is measurably conceded that the car hit the hind part of the hind wheel, and that the horse and wagon were nearly 19 feet in length. The motorman himself testified that he stopped the car in from twenty-five to thirty-five feet after he applied the brake. That testimony is strongly corroborated by other witnesses, and the mere advisory testimony of defendant's experts to the effect that it could not be done, in the face of the fact that it apparently *was* done, by no means presents a case for judicial interference. As we read the motorman's testimony he does not well account for the fact that he failed to see this boy until he "started on the track," whatever he meant by that. What was he doing that he did not see? But commencing with the time the boy and his equipage were in danger and going to the time when his wagon was hit, he traveled for such a length of time and for such a distance in plain peril that it may be shown by mathematical calculation that the car at its rate of speed could have been stopped, had the motorman been vigilant and diligent, in time to have saved him. The car was going from three to four times faster than the horse. If the horse covered nineteen feet while the boy was in peril on the track, the car covered fifty-seven or seventy-six feet, agreeably to a speed of either six or eight miles per hour. This distance left an open field for full play to the humanity rule.

We are of opinion both demurrers were well ruled.

## II. *Of error in giving instructions.*

Defendant argues there is error in two of plaintiffs' instructions—the first and second. Those instructions are as follows:

"1. If you find from the evidence that on September 5, 1906, the plaintiffs were husband and wife and that Carl Ellis was their natural born child, that he was unmarried and about fifteen years of age, that on said day he was driving a one-horse wagon on East Fifteenth street, a public highway of Kansas City, Missouri, that as he was crossing the track of said defendant at Bristol avenue said wagon was struck by an east-bound car of said defendant and said Carl Ellis was thrown out of said wagon and upon or near the track and struck and run upon by said car and was so bruised and crushed that he died as a direct result of said injuries, and if you further find from the evidence that in crossing said tracks said Carl Ellis was in a perilous situation arising from danger of being struck by said car and that defendant's motorman saw or by the exercise of ordinary care could have seen him in said situation of danger, and that thereafter said motorman was negligent, in that he failed to exercise ordinary care in the use of the means at his command to avoid said collision (if you find he so failed) and that said motorman with due regard to the safety of his passengers could with ordinary care in the use of said means have avoided said collision and that as a direct result of said failure (if any) said wagon was struck and said Carl Ellis injured as aforesaid, then your verdict should be in favor of the plaintiffs, and you will assess the amount of the penalty at such sum, not less than two thousand dollars and not more than ten thousand dollars, as you may in your discretion determine. And this you will do even though said Carl Ellis was negligent in crossing or going upon said

tracks without looking or becoming aware of the approach of said car.

"2. You are instructed that it was the duty of defendant's motorman to keep a reasonable lookout for persons upon the track or approaching said track and going into a situation of danger, and if you find that deceased was approaching said tracks and that he was unconscious of the approach of said car and that it was apparent to a reasonably prudent person that he was unmindful of danger and was going upon said track, then it was the duty of the motorman to at once have taken precaution to avoid the collision."

(a) The vice of the first instruction in part is said to be there was no evidence to support it; and that there was no evidence that the motorman saw or could have seen the boy in peril in time to have avoided the collision by the use of the means at his command. But we have heretofore ruled both those contentions against defendant in ruling that the case fell within the humanity doctrine and, on the facts present, was for the jury.

The instruction is attacked from another side, viz., for its use of the word "tracks" instead of "track." The argument is advanced that such plural form of the word was calculated to mislead the jury into believing that decedent's peril began when he was crossing the north track. We must hold against defendant on the point for a group of reasons, viz.:

Its own given instruction (No. 8) used the plural in the same connection. *Ergo,* if error it was, it was common to both sides and became innocuous and non-reversible. *Consensus tollit errorem.*

Again, defendant asks an instruction (No. 6), refused because mandatory, using the plural form "tracks." Wherefrom we infer defendants appellate theory of error, coiled up in "tracks" was not its trial theory. The trial theory attends a case on appeal as a right warm frock of protection against any chill from

adverse criticism based on a new revelation, a contrary theory.

In the next place, the use of the plural form in the connection it was used was proper. The two tracks were close together, the car was running on the south track and there came a time while the boy was on the north track that his horse was on the south. From thence onward to the end, obviously, the boy was in a danger, imminent and about to fall. To tell the jury that "if you further find from the evidence that in crossing said tracks said Carl Ellis was in a perilous situation," etc., was within the case made. It was put to the jury to find the danger, and certainly it was there to find.

Finally, it is said the instruction erroneously assumes the boy was not aware of the approach of the car and went upon the track without looking. On such premise, it is argued that this is too favorable to plaintiffs and excludes another theory, viz., that deceased looked and saw the approaching car, and in racing with death lost the race. But the last hypothetical theory is not within the evidence, hence is not in the case. The eye witnesses agree the boy did *not* look west when he approached the tracks; *contra,* his face was steadily turned in another direction. The car was coming behind him until he turned to cross the tracks diagonally, and thereafter till the fatal moment it was coming from an angle substantially at his back. Every eye that followed him to his death saw him looking steadfastly and sturdily to the southeast. It is not error to assume as true a conceded fact or one assumed as true on the record by the adversary parties. [Davidson v. Transit Co., 211 Mo. 320.] It would have been in better conventional form if the instruction had left it to the jury to *find* the boy negligent through a failure to look. But the whole case was tried below on both sides on the theory he did not look or see the car, and it would not do to reverse the

judgment for an error in form that could not, in reason, affect the merits.

The instruction, as a whole, under the facts present, properly stated the humanity rule which proceeds on the theory that decedent was negligent in not looking, and that his life should have been saved in spite of his prior negligence if, after being aware of his peril, defendant's servants could have done so by the use of ordinary care. It was not reversible error to give it. [Matz v. Railroad, 217 Mo. 281; Epstein v. Railroad, 197 Mo. l. c. 736; Kinlen v. Railroad, 216 Mo. l. c. 160, *et seq.;* Felver v. Railroad, 216 Mo. l. c. 212, *et seq.;* Waddell v. Railroad, 213 Mo. l. c. 16, and cases cited.]

(b)   It is argued that the plaintiffs' second instruction was bad, for that it proceeds on a bundle of assumptions, viz., that the motorman did not keep a lookout, and that the boy was unconsciously going into danger. Further, that it is misleading in authorizing the jury to find a situation indicating that the boy was so unobservant as to at once charge the motorman with the duty of taking precaution and to assume that the inattention of the boy would continue too late to save himself.

Further that it invites the jury into a field of mere speculation and conjecture, is not supported by the evidence and is in conflict with instruction numbered 3 given for defendant.

On such several contentions, we rule as follows:

Instruction 3 for defendant reads: "If the deceased was negligent and such negligence directly contributed to his death, then there can be no recovery herein, and your finding must be for the defendant." If that instruction means that the prior act of negligence of Carl Ellis in going upon the tracks without looking westward to see if a car was approaching, defeats recovery, although defendant's servants, charged with a duty of vigilance in running their car

on the public street, might have seen his predicament
in time to have saved him by using ordinary care to
slacken the car's speed or stop, then it had no place
in this case under the humanity rule, and should have
been refused. In that sense it may be said to be con-
tradictory to plaintiffs' second instruction, but in so
far as contradictory, it was too favorable to defend-
ant. Excess of favor is not error of which the donee of
favor can complain. (Berry v. Railroad, 214 Mo. 1. c.
604.) However, if the instruction is to be read with
plaintiffs' as part of the whole body of the law of
the case (including defendant's eighth, which correctly
formulates the humanity rule) and held to mean that
if the boy went on to the track heedlessly in such
close proximity to the moving car that he could not
be saved by using ordinary care; and that the words,
"directly contributed to his death," mean a concur-
rent and coincident act of negligence, which (under
circumstances mentioned in plaintiffs' first and sec-
ond and defendant's eighth instructions) defeats re-
covery, then it was a good instruction. From the lat-
ter, and only permissible, viewpoint, instructions two
for plaintiffs and three for defendant are not contra-
dictory.

We have been unable to find the "assumptions"
seen by defendant's learned counsel. The first three
lines do not hold them in embryo. Those lines merely
announce the duty of the motorman and put it very tem-
perately at that. The words "reasonable lookout for
persons" are a very mild pronouncement of the rule.
Cases might be cited that characterize the duty as one
to keep a "vigilant watch"— e. g., Kinlen v. Railroad,
216 Mo. 1. c. 156. It has been ruled that the vigilant
watch ordinance of the City of St. Louis is but the an-
nouncement of a common law duty in congested urban
populations. [Deschner v. Railroad, 200 Mo. 1. c.
329.]

We see no invitation into a field of airy specula-

tion and conjecture. The whole instruction was germane to the facts. The jury were told that if they found the boy was approaching the track unconscious of the approach of the car and found it would be apparent to a prudent motorman that he was unmindful of his danger and was going upon the tracks, then it was the duty of the motorman to take precaution and avoid the collision. We have heretofore pointed out facts supporting that instruction. The crossing was rough and bespoke attention. His hands were on the lines. He was guiding his horse and keeping it going. His face was turned from the car at all times. If the evidence is to be believed, it was plain he was approaching the track bent on crossing it at a gait and with a demeanor showing unconsciousness of impending danger. Under the facts, a reasonably prudent motorman could see so much as that, if on watch and performing his duty in looking out. That duty did not commence merely when the horse's feet were actually on the south track. It commenced at such time as a prudent motorman could see that he was intent on pursuing his journey across the track, oblivious to danger from the car. Then was when he came within the danger zone, and at and after that time the motorman, whose duty was to see him, was not entitled to supinely await the event to see if the boy would save himself. He was obliged to act on reasonable appearances, put his car under control (if not already so), slack it, if he could, and stop it if necessary and if it could be done. [Holden v. Railroad, 177 Mo. l. c. 469 *et seq.*; Bunyan v. Railroad, 127 Mo. l. c. 21; Barry v. Transit Co., 119 Mo. App. 38; Moore v. Transit Co., 194 Mo. l. c. 11 *et seq.*; Cytron v. Transit Co., 205 Mo. l. c. 720.] If the conduct and actions of a party approaching a street railway track would lead a motorman of ordinary prudence to conclude that such party was going upon the track in front of the car, the right of the motorman to act on the presumption that the person

would stop before going on the track ceases. [Eckhart v. St. Louis Transit Co., 190 Mo. 1. c. 618 *et seq.;* Murray v. Transit Co., 108 Mo. App. 1. c. 510; Aldrich v. Transit Co., 101 Mo. App. 1. c. 89. See Deschner v. Railroad, 200 Mo. 1. c. 331, *arguendo.*]

There was no error in giving plaintiffs' instructions numbered 2.

III. *Of error in refusing instructions.*

Defendant complains of refusing its instructions 7, 9 and 12. Instruction 7 told the jury, in effect, that the motorman could rest on the assumption when he saw the boy approaching the track that he would stop and not go on the same; and that he owed no duty to give warning and either stop or check the speed of the car until there was actual danger of a collision. That was not the law of this case, where there was evidence tending to show to a reasonably prudent person that the boy, unconscious of his danger, was apparently intent on continuing his journey on and over the track. The instruction was well refused.

Refused instruction numbered 9 was a mandatory one to find for defendant if the jury believed from the evidence that the boy did not look or listen, when by looking he could have seen, or by listening he could have heard, the approaching car before going upon the track. That instruction is not the law of any case to which the humanity rule is applicable; for if such antecedent act of negligence shuts off liability, although by the exercise of ordinary care after I put myself in deadly peril, a motorman could save my life, then the humanity rule is exploded as a working theory of the law and all the learning thereon goes pellmell to the dust heap. The instruction was well refused.

Refused instruction numbered 12 told the jury there was no evidence that a failure to ring the bell was the proximate cause of the accident, and that re-

covery would not lie on that ground. Of this instruction it may be said it could have been given without error. There was persuasive testimony *pro* and *con* on the sounding of the bell, but plaintiffs' instructions did not put that issue to the jury. However, by defendant's instruction 15 the jury were told that although they found the bell was not sounded such fact did not warrant a recovery. Giving it once was enough; hence instruction 12 had no office.

IV. *Of error in admission and exclusion of testimony.*

The rulings complained of are; (1) admission of testimony tending to show there was no crossing for teams in the region except the one used by decedent (and herein of the condition of the street at the *locus in quo*); (2) tending to show a failure to ring the bell; (3) directed to the incompetency of one Francis to testify to the speed of the car; (4) directed to the incompetency of one Hall to testify as an expert on the distance in which the car could be stopped; and (5) the refusal to admit two items of testimony on behalf of defendant.

(a) By one Dyche, it was shown that the pavement was fresh and green, that is, had just been grouted with cement slush; and that there was only one crossing for teams, viz., the one used by decedent, put in temporarily and laid roughly for such use. Some of this evidence showed teams were not "permitted" to cross elsewhere. Some of it, that teams were not in the "habit" of crossing except at that point. Some of it, that there was no crossing at that time for teams aside from the temporary one at Bristol avenue. Counsel lays stress on the idea that defendant could not control the actions of the city or private individuals, or the right of the citizen to cross and recross the street; therefore, should not be prejudiced thereby. But at root it was not so much a prohibition

by the city or by officers or private individuals as a prohibition or invitation springing from existing facts—*ex necessitate rei*. If the pavement was green, if a temporary crossing was provided and if there was no place elsewhere a team could cross with propriety because of the green pavement or excavations made in paving, those were obvious facts of which defendant should take notice. If teams were in the habit of using this crossing because of such conditions, then, that very public use carried and blazoned abroad its own notice. The testimony was admissible to show the environment, conditions and circumstances at the *locus in quo*. It threw light upon the correlative issues of negligence and contributory negligence. We rule the point against defendant.

(b). When plaintiffs' testimony was going in, a part of it tending to show no bell was sounded as the car approached the crossing was objected to, as immaterial and not within the issues.

One of the allegations in the petition was that "no proper warning was given deceased of the approach of said car," etc. The answer denied that averment. Therefore, the testimony was within the issues.

Under the humanity rule the duty of the motorman is graduated according to circumstance. If he can warn and thereby save life, he should do so. If it be apparent that warning when made is, or if made will be, ineffectual, he should check his speed and stop if possible, out of tenderness to life and limb. If he had been warned by a sounding bell, this boy, though heading towards danger, might have been kept out of it (Cytron v. Transit Co., 205 Mo. l. c. 719, and cases cited); or if actually in danger, he might have quickened his pace and escaped by getting over. In this case he was almost in safety, as the blow on the hind wheel shows. In any event, a warning is within the scope and meaning of *due care*. But, and however that be, as plaintiffs abandoned the issue by asking no in-

struction on it and defendant got an instruction favorable to its view, it is in no situation to complain. The point is ruled against it.

(c). A witness, Francis, had observed the running of street cars in Kansas City. He saw the speed of this car and was asked to put an estimate on it. His testimony was objected to because of lack of qualification. Under the doctrine of Stotler v. Railroad, 200 Mo. l. c. 123 et seq., and cases cited and reviewed, that objection was not tenable. However, the estimate of this witness did not vary materially from that by defendant's. So that if Francis's testimony be allowed some value, it could not have injured defendant in the state of the proof here. The point is disallowed.

(d). It is next contended that one Hall, who testified in an advisory capacity as an expert for plaintiffs on the distance in which a car could be stopped at a given speed, equipment, load, grade and condition of track, was not qualified as an expert; hence his testimony should have been rejected. Defendant tried to have that done and failed. The conductor (for defendant) makes the car run fifteen feet after the motorman became busy with his brakes until it hit the wagon and five or ten feet thereafter. That amounts to saying the car was stopped after the brake-shoe dragged in, say, from twenty to twenty-five feet. The motorman (for defendant) makes it run from twenty-five to thirty-five. Hall, on a hypothetical question, said it could be stopped in from eighteen to twenty-five feet. His advice on the point so nearly agreed with some of defendant's testimony that it is hardly worth while to consider the question of his competency as affecting the merits of the case. But we rule there was testimony showing he was qualified to speak as an expert. He had worked for defendant as a motorman on the street in question for eleven weeks on the same character of car and was familiar with the equipment. He was not a seasoned veteran, whose advice had behind

it a long and varied experience, but his experience was enough to justify the court in permitting him to testify—the value of his advice was for the jury.

We have held that when a car actually stops in a certain distance, there is no need of theorizing upon inability to stop in that distance. In such case an expert is *functus officio.* [Beier v. Transit Co., 197 Mo. l. c. 231 *et seq.*] Indeed, per MARSHALL, J., in Latson v. Transit Co., 192 Mo. l. c. 466-7, it was said to be "contrary to the physics of the case, and to the common knowledge of all men" to hold that a car going six or seven miles an hour could not stop in eighty feet on a level street. That ruling amounts to abolishing the office of an expert under the circumstances stated in the Latson Case.

The premises all considered, we disallow the point to defendant.

(e). It is next argued there was error in excluding competent testimony. Defendant put on the stand one of its claim agents, Mr. Worthington, who testified favorably on its side. It seems he "investigated" this accident, interviewed the witnesses, and was instrumental in taking sworn statements from some, and in taking another eye-witness to defendant's headquarters where he was interviewed. In the progress of his testimony, in view of his cross-examination, learned counsel undertook to show by him the custom of the company to investigate and the purpose and cause of that custom. That testimony was objected to and excluded. A tender was then made of proposed testimony, showing the custom existed, that its purpose was to determine whether the employees of the company were at fault, and upon that determination to adjust cases wherein the company finds itself at fault and to decline to adjust when not in fault. The testimony was calculated to draw the attention of the jury away from the real issues, and fasten it on a purely collateral matter, viz., the benevolent and just disposi-

tion of defendant to compromise and settle when in fault, or its courageous disposition to stand up for its rights in defending lawsuits without merit. Such primal virtues presumably attend all persons, including corporations. But the issue on trial was not whether defendant was humane and just, keenly alive to its duties and liabilities; or, on the other hand, was litigious, prone to shirk duty and avoid just liabilities. The real issue was whether, under the pleadings and circumstances, defendant was liable, not because of its lack of civic virtue, or because it was equipped with such virtue, but because the facts cast liability upon it or relieved it from liability. Test the matter by putting the boot on the other foot. Suppose plaintiffs had undertaken to show that defendant habitually refused to settle other meritorious cases after investigation had disclosed liability. Suppose plaintiffs had undertaken to show that the investigation of its claim agents was merely to locate or gather evidence to aid defendant in its defense to a lawsuit, by way of preparedness for an unjust war, rather than to maintain a just peace. Would testimony of that character have been admissible? Certainly not. And yet what defendant sought to show was of kin to or the converse of that. There was no error in the ruling.

V.   *Of error in the concluding argument of plaintiffs' counsel.*

The bill of exceptions shows that plaintiffs' counsel commented, *arguendo,* on the motorman's experience and qualification; for that he was shown to have been in charge of a car about one week and in actual service about half that time. (*Nota bene*: The motorman's testimony justified that view of it). At this stage counsel for defendant asked the court to instruct the jury that the argument was improper and that there was no such issue in the pleadings. To that request the Court responded by an inquiry to counsel,

viz.: "Would not that argument be proper on the question of whether he could not stop the car after the boy was in a place of danger?" A direct answer to that inquiry was not given, but this followed: "I am now simply invoking the judgment of your Honor on the proposition that the question of competency or incompetency of the motorman cannot be an issue under the pleadings in this case." Then the court: "His competency does not become an issue in this case until the boy is in a position of danger." Then counsel: "Yes, sir." Then the Court: "After that I think that is legitimate argument." At the close of this incident defendant excepted to the ruling, and at the close of the argument asked and was refused the following instruction, number 18: "The experience or inexperience of the motorman is not an issue in this case, and you will not consider the same in making up your verdict, and you are further directed to exclude from your consideration all remarks made by counsel in regard thereto."

Such record justifies the following observations:

Counsel did not in terms object to the remarks of adversary counsel, nor did he ask the court to rule them out as improper and to admonish or reprimand counsel. Usually an objection to remarks during argument takes that form. But in this case the interpolation must be held to mean a request for an instruction to the jury. That instruction finally took form and substance in the one offered. The question then is: Was the instruction proper? We think the effect of that instruction in the form it was offered would be to deny to plaintiffs' counsel the right to comment on the testimony. The charge in the petition was that the boy's death was caused "by the negligence, *unskillfulness*," etc., of defendant's servants. Inexperience is the mother of unskillfulness and negligence. Without quoting further from the bill of exceptions, it is sufficient to say it shows that defendant, deeming the fitness of the motorman a proper matter of inquiry, went

at length into his skill and experience in his duties, his schooling in his business, his qualifications and knowledge of the use of the equipment for running, controlling and stopping the car. What was that for? The motorman was cross-examined along the same line. What was that for? But one answer can be given to these questions, viz., that all sides considered those elements as bearing upon the issues. In that view of it, the qualifications of the motorman were proper subject of comment. Although the case does not turn directly on the unskillfulness of the motorman, it does turn on his lack of due care. And if this motorman lacked experience, it is but one step further to say that he lacked a thing pertinent to due care. The point is disallowed to defendant.

VI. Finally, it is argued the verdict is excessive and the product of baneful influences, viz., prejudice and passion.

The verdict was within the limits prescribed by the lawmaker. We cannot say it indicates passion and prejudice. Under section 5425, Revised Statutes 1909, the jury are to gauge the penalty at not less than $2000 nor more than $10,000. Between that minimum and that maximum, observe, the statute leaves it to "the discretion of the jury," not to the discretion of the *court*. The lawmaker may ordain that the discretion of the jury has play down or up between those two sums. [Young v. Railroad, 227 Mo. 307.] If it be that we have power to review the discretion of the jury under that statute (a proposition we do not decide in this case), yet how are we to say its discretion was unreasonably exercised, absent any untoward matter reasonably inciting judicial complaint, or provoking judicial discretion?

The premises considered, the judgment is affirmed. All concur.